UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

TODD McMILLEN                                                    PLAINTIFF

*and*

COMSTOCK BROTHERS ELECTRIC COMPANY

*and*

KENTUCKY ASSOCIATED GENERAL
CONTRACTORS SELF-INSURANCE FUND,

*as administered by*

LADEGAST & HEFFNER CLAIMS SERVICE, INC.          INTERVENING PLAINTIFFS

v.                                               CIVIL ACTION NO. 3:07-CV-309-S

FORD MOTOR COMPANY                                               DEFENDANT

## <u>MEMORANDUM OPINION</u>

 This matter is before the Court on cross-motions for summary judgment filed by plaintiff

Todd McMillen and defendant Ford Motor Company. For the following reasons, the Court will grant

the plaintiff's motion in part, deny it in part, and deny the defendant's motion *in toto*.

## BACKGROUND

 The essential facts are not in dispute. Ford Motor Company operates a facility called the

Kentucky Truck Plant (KTP). For the past decade, it has been party to a "construction commodity

management" (CCM) contract with Abel Construction Company. Under this arrangement, Abel

provides construction and maintenance work at the KTP on a non-bid basis for projects worth less

than $1 million. Pursuant to this agreement, Abel has designated Comstock as an "alliant

partner"—one of two electrical subcontractors hired to perform work at the KTP under the CCM

contract. Comstock and Abel each maintain a permanent construction trailer on KTP premises. Comstock employed McMillen as an electrician; at the relevant times his job title was Superintendent. He maintained an office in the Comstock trailer at the KTP and did virtually all of his work for Comstock at the Ford site.

On May 19, 2006, McMillen was on KTP premises reviewing a new project. The proposed work involved installation of new display panels, along with the necessary wiring, as part of a large new construction project referred to as P-356. McMillen met Mike Geis, Vice President of Abel Construction, at the proposed work site to discuss the project, and McMillen then remained to take notes regarding what would be necessary to put together a price proposal.

After he had finished, a co-worker, Steve Reed, offered him a ride out of the plant in a motorized cart. Reed's route took him through a high-speed roll-up door, which is generally kept closed. To pass through it and exit the building, one must normally activate a pull cord. The door then opens and remains in the up position for 11 seconds, at which point it closes automatically. As Reed 's cart approached the door on this occasion, however, another employee (also on a cart) had opened the door from the outside in order to enter the building. Reed did not pause to re-activate the pull cord (which would have reset the 11-second timer), opting instead to speed through the opening before the door closed. The case is now in court because Reed misjudged the door: It began to close as the cart passed underneath it, struck McMilllen on the head (he was wearing a hard hat), and caused him serious injury.

The door in question was discovered to have lacked functioning safety features. Specifically, Ford's internal incident report found that the door's reversing safe edge (designed to stop the door if it strikes something in order to minimize injury) was not in working order. It also apparently

lacked interior induction loops (an automatic door-opening mechanism) and interior LED safety photo eyes. (The door did have photo eyes on the exterior of the building, which ultimately stopped and reversed it, but not until after McMillen had been struck and injured.) Work orders for repair of the safety edge had been generated on April 24 and 26, 2006, but neither had been completed before McMillen's injury.

McMillen has now sued Ford for negligence in maintaining the door and its safety features. He has already recovered (from Comstock via its insurance company) the damages allowed through Kentucky's worker's compensation scheme, and now seeks additional money from Ford. Ford responds that it was not negligent and that in any event recovery is foreclosed by Kentucky's "up the ladder" rule, which protects a contracting company from liability for on-the-job injuries to the employees of its contractors. Both parties have moved for summary judgment.

## DISCUSSION

A party moving for summary judgment has the burden of showing that there are no genuine issues of material fact and that the movant is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party is required to present some significant

probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in the light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

Sitting in diversity, the Court will apply Kentucky law to resolve the questions at hand. *Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 573 (6th Cir. 2008) *(citing Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).

Plaintiff has moved for partial summary judgment on the issues of duty and breach, conceding that he has not yet established causation and damages as a matter of law. Ford seeks summary judgment on the basis that it is entitled to the protection provided employers under Kentucky's workers' compensation statute. It also asks for judgment against the intervening defendants, who seek to recover the worker's compensation funds paid to McMillen. We address these motions in turn.

## I.

McMillen has moved for judgment as a matter of law regarding two elements of his *prima facie* negligence case.

### A.  Duty

At the time of his injury, McMillen was an invitee on Ford's premises, "a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." *Lanier v. Wal-Mart Stores, Inc.*, 99 S.W. 3d 431, 432 (Ky. 2003) (*quoting* Restatement (Second) of Torts § 332(3) (1965)). He was invited onto the land in

connection with Comstock's business with Ford, and he was plainly neither a trespasser nor a licensee (the other categories of individuals to whom a landowner may owe a duty of care).[1]

A landowner is subject to liability for physical harm to an invitee caused by a condition on the land if he:

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees; and
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it; and
> (c) fails to exercise reasonable care to protect them against the danger.

*Id.* at 433 (*quoting* Restatement (Second) of Torts § 343). This three-part inquiry defines Ford's duty of care. Or rather, Ford may have owed McMillen a duty of reasonable care, but only if elements (a) and (b) above are met.

*(a)    Knowledge of the Condition and Risk of Harm*

It appears irrefutable that Ford knew of the faulty safety equipment on the door in question. The incident report filed after McMillen's injury recites:

> Preventive maintenance records indicated the hazard [the non-functional safety edge] was identified April 18, 2006. General inspection confirmed Door #1 malfunction on April 22, 2006 and a work order was generated on April 24, 2006.

(Pl.'s Ex. 2, Ford Incident Report 2 (May 19, 2006)). A second work order was evidently generated on April 26. Ford, through its agents, thus had knowledge of the equipment problems that McMillen blames for his injuries.

Ford also cannot deny that it was aware of the risk of harm posed by the malfunctioning equipment. Roll-up doors of the type that injured the plaintiff are equipped with safety features

---

[1] The question whether he was an employee bears on the validity of Ford's workers' compensation defense, discussed *infra*. It has nothing to do with the premises liability negligence tort alleged on the face of the complaint. If the "up the ladder" rule applies, it serves as a defense to recovery, not as a negation of the elements of the tort itself.

precisely because a falling door can cause serious damage to a person or property passing underneath it. While Ford argues that this particular door was not subject to its safety standards, the fact that it had a policy of implementing devices such as safety edges and photo eyes shows that it knew that doors lacking such features pose a danger to its employees and others on its premises.

(b)      *Expectation that Invitee will Fail to Realize the Danger*

As defendant points out, McMillen was a near-constant presence at the plant, and could be expected to know of the danger of a falling door. But he could also have been expected to think that safety measures would be in place to protect him should a door begin to fall. He does not seem to have had any way of knowing that the door's safety features were not operational. Because Ford knew of the danger, and also knew that it was the sort of danger that would not be obvious to someone not warned about it, it should have known that McMillen (and others) would not have realized the danger posed by the door. Consequently Ford also should have expected that McMillen, or another person in his situation, might fail to protect himself from the unknown risk of a door with a non-functioning safety strip. We therefore hold that Ford owed McMillen a duty to exercise reasonable care.

### B. Breach

Although Ford evidently knew of the faulty safety equipment on the door, it does not appear to have done anything to address the problem or to protect its invitees from danger. McMillen was not warned that the door's safety features were inoperable, and the door was neither locked out (i.e. prevented from either opening or closing) nor repaired in the three weeks between discovery of the faulty safe edge and the accident. Any of these steps would have reduced the risk of injury and/or minimized its extent.

Ford did, however, provide other safety mechanisms. The door was equipped with an external set of photo eyes that did stop and reverse the door, albeit too late to prevent it from striking the plaintiff. In addition, the door's pull-cord opening mechanism was functioning properly. Had Reed stopped the cart to pull it, thereby resetting the timer, the cart would have had plenty of time to pass through the door safely. Both McMillen and Reed were aware that the cord should have been pulled, but neither of them took that step. This fact might be seen as an issue of comparative fault or of legal causation (and defendants are free to raise those arguments before the jury), but we think the existence of the pull cord and the reflector eyes also creates an issue of material fact as to whether the door was maintained in an unsafe condition. It indicates that Ford provided a means by which the door could have been rendered completely safe, and it may be the case that in so doing the company satisfied its duty of reasonable care. That question we leave to the jury.

In the Court's view, plaintiff has failed to establish as a matter of law that Ford breached its duty to McMillen as an invitee. Further, the evidence suggests that Reed, McMillen, or both may bear some responsibility as to causation and damages. Accordingly, summary judgment is inappropriate. As explained above, however, we do hold that Ford was required to exercise reasonable care with respect to the plaintiff.

## II.

Having disposed of the plaintiff's motion, we now consider the defense's attack on the idea that it can be sued in this situation. Ford argues that it is protected by Kentucky's Workers' Compensation Act, KRS 342.001 *et seq.* Specifically, it claims that workers' compensation is the sole remedy for on-the-job injuries in Kentucky, and that it is therefore not susceptible to a negligence suit.

The exclusiveness provision, KRS 342.690(1), provides: "If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee . . . ." Because McMillen has undisputedly received workers' compensation benefits through Comstock's insurance policy, this statute would bar him from recovery in tort if Ford is considered his "employer."

As to this question, KRS 342.690(1) goes on to say that "the term 'employer' shall include a 'contractor' covered by subsection (2) of KRS 342.610, whether or not the subcontractor has in fact[] secured the payment of compensation." In turn, KRS 342.610(2) defines a contractor as a "person who contracts with another . . . [t]o have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person."

The courts have read these sections together as forming the basis for the "up the ladder" defense: "an entity 'up the ladder' from the injured employee and who meets all the qualifications of a 'contractor' under KRS 342.610(2) is entitled to the immunity provided by KRS 342.690." *Davis v. Ford Motor Co.*, 244 F. Supp. 2d 784, 786 (W.D. Ky. 2003) (*citing Goldsmith v. Allied Bldg. Components, Inc.*, 833 S.W.2d 378, 381 (Ky. 1992)). But a contractor may only assert this defense if it was potentially liable under the workers' compensation scheme; without such potential liability, there is no sense in extending "up the ladder" protection. *See* KRS 342.690(1); KRS 342.610(2). The question, then, is whether McMillen qualified as a statutory employee of Ford at the time of his injury.

McMillen was employed by Comstock as an electrician and superintendent. Comstock was contracted by Abel, who had been hired by Ford under the CCM to provide certain services on a

non-bid basis.[2] McMillen, by his own account, spent "99.5%" of his time with Comstock at the KTP. (McMillen Dep. 31.) He had an office in a trailer on Ford's premises. As an electrician for Comstock, he worked almost exclusively on Ford projects.

However, at the time of the accident, it appears that McMillen had been working for Comstock itself, and not for Ford. Before getting into Reed's golf cart and driving out the door, he had been evaluating a proposed worksite in preparation for writing up a bid. Before Comstock undertook any work on the project, it was required to submit the bid to Abel, which then used it to craft its own proposal to Ford. Ford then had the option to accept or reject the quoted terms.

Ford argues that because Comstock "only performs work at the KTP pursuant to the CCM, it only follows that any work whatsoever performed by Plaintiff is also pursuant to the CCM." (Def.'s Br. 11.) This is unpersuasive. A subcontractor develops a bid in the hopes of winning a project from another organization. Whatever their contractual arrangement, Ford surely was not paying Comstock to put together a proposal so that it could then consider hiring Comstock to actually do the work. McMillen was working strictly for Comstock, preparing a bid to submit to Abel, when the door fell and injured him.

This conclusion is buttressed by two additional facts. First, the CCM contract, as described by the defense, involved work performed on a "non-bid basis." (Def.'s Br. 2.) It is hard to see how preparing a bid can fall under the aegis of a contract whose purpose is to avoid the bidding process. Second, the project McMillen was reviewing prior to his injury evidently did not fall under the CCM at all. Instead, it was a "Field Action Request" (FAR) related to the P-356 project. Geis, Abel's Vice President, testified in his deposition (contradicting statements in his affidavit) that a FAR "is not

---

[2] Because the record contains neither the CCM nor Comstock's contract with Abel, it is difficult to grasp the precise relationship between the parties.

under the CCM blanket." (Geis Dep. 43.) So, although there was an existing contract (the CCM) under which Comstock and McMillen operated much of the time, certain projects fell outside the scope of that contract—including the one on which McMillen was working at the time he was injured.

While McMillen acted for workers' compensation purposes as a Ford employee during much of his time with Comstock, he was not doing so at the time of his injury. The critical issue is which of these roles matters to this litigation. Is it more important that he was frequently a Ford "employee," or that he was not acting as one at the time in question?

The statute's text is inconclusive. It defines a contractor as someone "who contracts with another . . . [t]o have work performed," without specifying whether "contractor" status lasts only during the performance of that work. KRS 342.610(2). Ford did contract with Comstock to have work performed, but McMillen's injury occurred while he was performing work for Comstock itself, and not (at least, not directly) for Ford. The language of KRS 342.610 does not specify how to address this situation.

We can take some guidance from *Davis*, *supra*. There, an employee of a company that supplied roof panels for Ford trucks was injured as a result of Ford's alleged negligence in providing a damaged shipping rack. 244 F. Supp. 2d at 786. Ford raised the up-the-ladder defense, to which the plaintiff responded that his employer was not a contractor, but merely a supplier. Predicting Kentucky law, the court determined that the statute does not protect mere purchasers of goods. *Id.* at 789. Because the plaintiff's employer was merely a supplier, there was no contractor-subcontractor relationship on which to rest the up-the-ladder defense. Importantly, the court observed:

-10-

> Naturally, different scenarios could produce different results. If Davis had been
> injured while installing or assisting in installing a crew cab roof into a Ford truck,
> repairing or inspecting roof panels at Ford's plant, collaborating with Ford on the
> design of the roof panels, or performing some other service relating to the installation
> of the panels, the outcome of this case might change.

*Id.* at 790. It matters, that is, exactly what an employee is doing at the relevant time. What is important is whether the plaintiff can rightly be considered an "employee" of the defendant at the time he is injured. If so, the plaintiff can recover workers' compensation benefits without proof of fault, and the defendant is protected from suit. If not, the defendant is vulnerable in tort.

Also instructive is *Yancey v. JTE Constructors, Inc.*, 471 S.E.2d 473 (Va. 1996), which dealt with Virginia's similar workers' compensation regime. An employee of a supplier was injured while delivering his company's products to the purchaser, and sought to recover in tort from the purchaser. The defendant company claimed protection under Virginia's workers' compensation statute, but the Virginia Supreme Court rejected that argument. It held that in order to be considered an employee for purposes of the statute, a plaintiff must be "engaged in the trade, business, or occupation" of the employer. Because the plaintiff was doing the business of his direct employer (and not that of the defendant) at the time he was injured, the up-the-ladder defense failed. The Court held:

> The principle is well established that a general contractor is the statutory employer
> of a subcontractor's employee . . . if the employee is engaged in the trade, business,
> or occupation of the general contractor at the time of his injury. But when the
> employee reaches an employer in the ascending scale, of whose trade, business or
> occupation the work being performed by the employee is not a part, that employer
> is not the statutory employer of the employee.

*Id.* at 474. The court then provided contrasting examples to make its point concrete:

> While each case turns on its own facts, we have held that an employee of a company
> supplying materials is not engaged in the trade, business, or occupation of the
> general contractor when the employee is injured while delivering the materials to the
> job site. However, if an employee undertakes activities which incorporate the
> delivered materials into the construction project, such as spreading and preparing the

-11-

> sand that the employee delivered to the job site, the employee has gone beyond the activities required for delivery and engaged in construction activities. Under such circumstances, we have held that the general contractor is the statutory employer of the subcontractor's employee because, at the time of injury, the employee was engaged in the trade, business, or occupation of the general contractor.

*Id.* at 474-75 (citations and internal quotation marks omitted). The relevant question is what the plaintiff was doing, and whose interests he was serving, at the time of the injury. If he is he merely delivering a product, he is not a statutory employee; but if he is helping to install it, he is an employee and therefore limited to workers' compensation to recover for his injury.

Similarly, we think Kentucky law limits the up-the-ladder defense to injuries sustained during work performed in the service of the entity seeking to assert the defense. No-fault workers' compensation benefits are available only for a "*work-related* traumatic event or series of traumatic events." KRS 342.011(1) (emphasis added). Courts have interpreted "work-related" narrowly to mean "arising out of and in the course of employment." *Seventh St. Rd. Tobacco Warehouse v. Stillwell*, 550 S.W.2d 469, 470 (Ky. 1976). "The rule is that compensation is not recoverable for injuries sustained by reason of a cause independent of and unconnected with the work of employment because such injuries are not brought about by conduct growing out of and incident to the employment." *Chesser v. Louisville Country Club, Inc.*, 313 S.W.2d 410, 411 (Ky. 1958) (*citing Hayes Freight Lines, Inc., v. Burns*, 290 S.W.2d 836 (Ky. 1956)). McMillen's injuries were not related (except very tenuously through the bidding process) to any work done for Ford, and Ford consequently was not responsible for his statutory benefits. Instead, he recovered those benefits from Comstock, the company that actually employed him at the time of his injury. But because the plaintiff's injuries do not qualify for no-fault benefits from Ford, Ford also does not qualify to assert that it is immune from suit.

-12-

Although McMillen spent much of his professional time on work for which Ford would be considered his statutory employer, the fact that on this occasion he was working specifically and exclusively for Comstock prevents Ford from claiming him as an employee for purposes of this lawsuit. Consequently, Ford cannot assert the up-the-ladder defense, and its motion for summary judgment must be denied.

## III.

Finally, Ford claims that the up-the-ladder defense shields it from liability to Comstock and its insurance company, who have intervened in this case. *See Fireman's Fund Ins. Co. v. Sherman & Fletcher*, 705 S.W.2d 459 (Ky. 1986). Because we hold that Ford's defense fails with regard to McMillen, we must reject it as to the other defendants as well.

## CONCLUSION

For the foregoing reasons, the Court will grant McMillen's motion for summary judgment in part and deny it in part. Ford's motion for summary judgment will be denied in its entirety. The Court will enter a separate order in accordance with this opinion.

Charles R. Simpson III, Judge
United States District Court

-13-

December 17, 2009